UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
NADINE BAYONNE,

                                              Plaintiff,

                    -against-                              **JURY BY TRIAL DEMAND**
                                                          **COMPLAINT**

PRIVILEGE UNDERWRITERS, INC. d/b/a PURE
INSURANCE, and MARTIN LEITCH,

                                              Defendants,
-----------------------------------------------------------------------X


## JURISDICTION AND VENUE

1. This action arises under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.

2. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of operative facts and form part of the same case or controversy.

4. Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b), because Defendants maintain and operate a principal place of business at 44 South Broadway, Suite 301, White Plains, New York 10601—within the Southern District—and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

**PLAINTIFF**

5. Plaintiff Nadine Bayonne hereinafter ("Plaintiff ") or ("Plaintiff Bayonne") ("Ms. Bayonne") resides at 28 Bedford Rd., New York, NY 10512.

**DEFENDANTS**

6.  Defendant, Privilege Underwriters, Inc.[1] hereinafter ("Defendants") or ("Defendants PURE") or ("PURE Insurance") or ("PURE") or ("The Company"), is a corporation conducting business in the state of New York under the name PURE INSURANCE. Its principal business place is 44 South Broadway, Suite 301, White Plains, New York 10601.

7.  Defendant PURE, through its service agent listed on the New York Division of Corporations inquiry, is represented by CORPORATION SERVICE COMPANY, located at 80 State Street, Albany, New York 12207.

8.  Defendant PURE performed one or more of the following actions while Plaintiff worked for Defendant: (1) hire the Plaintiff, (2) terminate the employment of the Plaintiff, (3) set the wage rate of Plaintiff, (4) maintain payroll records concerning the Plaintiff, or (5) institute work rules for the Plaintiff.

9.  Defendant MARTIN LEITCH hereinafter ("Defendant Leitch") acts as the CEO of Defendant PURE.

10. Defendant PURE and Defendant Leitch will hereby be referred to jointly as ("Defendants") unless otherwise noted.

## BACKGROUND FACTS

11. Defendant PURE employed Plaintiff Bayonne as a W2 non-exempt wage earner.

12. Defendant PURE hired Plaintiff Bayonne on March 20, 2022.

13. Plaintiff Bayonne stopped working for the Defendants on April 23, 2024.

14. Defendants employed Plaintiff Bayonne as a staff accountant.

15. Plaintiff Bayonne's job duties included maintaining accurate financial records, managing accounts payable and receivable, performing monthly bank reconciliations, and participating in month-end and year-end closing processes. Additionally, Plaintiff assisted in preparing financial statements managed fixed assets, supported compliance with tax regulations, and helped implement internal controls to ensure the integrity of financial information.

16. Plaintiff Bayonne worked approximately 40 hours per week during her tenure.

17. During her employment, Plaintiff performed her job duties primarily from Defendants' corporate office located at 44 South Broadway, Suite 301, White Plains, NY 10601.

---

[1] Privilege Underwriters, Inc. (PUI) is the holding company for The PURE Group of Insurance Companies, which serves high-net-worth individuals and families. PUI offers insurance products like homeowners, automobile, personal liability, and more. In 2019, it was acquired by Tokio Marine Holdings, Inc., and continues to operate under the PURE brand with a focus on creating a policyholder-owned model. PURE Programs. (n.d.). Tokio Marine to Acquire PURE Affiliated Group of Companies. www.pureprograms.com/about/newsroom/tokio-marine-acquire-pure-affiliated-group-companies).

18. Plaintiff worked more than 1,250 cumulative hours during the 12 months preceding her termination date and need for personal medical leave for her high risk pregnancy.

19. Plaintiff Bayonne held no managerial authority. She did not have the power to hire, fire, supervise, or discipline other employees, nor did she exercise control over scheduling, staffing, or employment policies.

20. Defendant PURE at all relevant times, employed more than 50 employees within a 75 mile radius of the Defendant's office that managed Plaintiff Bayonne employment.

21. On January 14, 2025, Plaintiff received a Right-to-Sue letter from the U.S. Equal Employment Opportunity Commission (EEOC), confirming her legal right to pursue claims against Defendants. **Ex. 1_2025.01.14_EEOC Right to Sue_**

## FAILURE TO UPHOLD STATED POLICIES ON DIVERSITY, INCLUSION, AND MENTAL HEALTH SUPPORT

22. PURE Insurance asserts that they are committed to "diversity, equity, and inclusion" as a core principle of their workplace culture, claiming that their teams are "diverse and inclusive" and that this diversity helps make "more sound decisions." Despite this, employees from minority backgrounds who face mental health challenges find themselves unsupported, and the inclusive environment PURE Insurance promotes is not reflected in how these individuals are treated.[2]



Figure 1. PURE Insurance's Commitment to Diversity, Equity, and Inclusion.

23. PURE Insurance asserts that their employees are "empathetic and focused on doing the right thing, always," particularly during difficult moments, such as when a member faces a personal crisis.

24. However, this empathy was glaringly absent when Plaintiff Bayonne, who was not only dealing with significant mental health challenges but also managing caregiver responsibilities for her

---

[2] Taken from PURE Insurance's corporate social responsibility and careers pages www.pureinsurance.com/about-us/corporate-social-responsibility; www.pureinsurance.com/careers on September 9, 2024.

father, sought support.

25. Despite her dual burdens of personal caregiving and mental health struggles, PURE Insurance failed to offer the same level of understanding and assistance to her as an employee, directly contradicting the company's stated values of empathy and support during personal crises.[3]

26. Instead of offering meaningful assistance or flexible solutions, employees like Plaintiff Bayonne encounter apathy and a rigid work environment, undermining PURE Insurance's claims of being a workplace that prioritizes "doing the right thing." [4]

## ONSET AND WORSENING OF MENTAL HEALTH CONDITION, LACK OF SUPPORT, AND FAILURE TO ACCOMMODATE

27. In or around the summer of 2021, during the COVID-19 pandemic, Plaintiff Nadine Bayonne began experiencing a series of debilitating mental health symptoms, including pervasive sadness, extreme fatigue, difficulty concentrating, disrupted sleep, and significant appetite loss. These symptoms progressively interfered with her ability to function in everyday life, marking the onset of what would later be diagnosed as Major Depressive Disorder.

28. Over time, these symptoms intensified. Plaintiff found herself withdrawing from social connections, struggling to perform basic personal care, and losing interest in all previously enjoyable activities. She would frequently go days without proper meals, as the thought of eating made her physically ill. Sleep became sporadic, with panic attacks and suicidal thoughts disrupting her rest on a nightly basis.

29. Recognizing that her condition was becoming unmanageable, Plaintiff began therapy in or around August 2021. The treatment helped stabilize her symptoms to some degree but did not eliminate the underlying disorder.

30. Throughout late 2021 and early 2022, Plaintiff remained in active therapy while continuing to experience significant psychological distress. Despite these challenges, she sought to return to professional life, believing that structure and purpose would support her recovery. Plaintiff Bayonne holds a bachelor's in finance and a master's degree in Corporate Finance.

31. Plaintiff holds a bachelor's degree in finance and a master's degree in Corporate Finance. In March 2022, she applied for a Staff Accountant position at PURE Insurance, eager to reengage with her field of expertise.

32. Following interviews and assessments, Plaintiff was offered the position of Staff Accountant. At no time during the hiring process did Defendants inquire about Plaintiff's mental health and physical condition or discuss workplace mental health policies or support resources related to

---

[3] Taken from PURE Insurance's corporate social responsibility and careers pages www.pureinsurance.com/about-us/corporate-social-responsibility; www.pureinsurance.com/careers on September 9, 2024.
[4] Taken from PURE Insurance's corporate social responsibility and careers pages www.pureinsurance.com/about-us/corporate-social-responsibility; www.pureinsurance.com/careers on September 9, 2024.

disability accommodation or leave. nor did it inform her of her rights under the ADA or FMLA The process was strictly limited to assessing her qualifications and conducting a background check.

33. Defendant PURE hired Plaintiff on March 20, 2022, and assigned her to report directly to Bhumika Thapa (hereinafter "Ms. Thapa"), Director of Financial Reporting, who remained Plaintiff's immediate supervisor throughout her employment.

34. During what should have been an onboarding and training period in April 2022, Plaintiff encountered immediate hostility and dismissiveness from her direct supervisor, Ms. Thapa. Rather than provide guidance or support, Ms. Thapa routinely rejected Plaintiff's reasonable questions about internal procedures and role expectations.

35. Ms. Thapa responses were frequently demeaning, condescending, and dismissive conduct that severely undermined Plaintiff's ability to acclimate to the company's processes and succeed in her role..

36. Despite her academic qualifications and prior experience, Plaintiff quickly discovered that PURE employed accounting practices that deviated from industry standards. These internal methods were not explained during onboarding, and no formal training was provided to bridge the gap.

37. As such, Plaintiff Bayonne needed guidance and training on how PURE Insurance wanted its unique processes and procedures carried out.  Instead of providing guidance or proper training on these company-specific processes, Ms. Thapa, Plaintiff's direct supervisor, refused to offer support.

38. In or around early April 2022, when Plaintiff sought guidance on company-specific procedures, Ms. Thapa responded with overt contempt, making remarks such as, "Do I also have to teach you this?" and "You should already know this." Merely two weeks into Plaintiff's employment, Ms. Thapa abruptly declared that Plaintiff was "no longer new" and stated, "I'm not showing you anything," thereby cutting off the training and support that any employee— especially one newly hired—requires to perform successfully. This deliberate withdrawal of guidance left Plaintiff isolated, confused, and vulnerable to unfair scrutiny.

39. The abrupt denial of training and support from Ms. Thapa had an immediate and detrimental impact on Plaintiff's mental health. As her requests for guidance were repeatedly met with hostility or silence, Plaintiff began experiencing acute anxiety in response to routine tasks.

40. Even basic work communications—such as sending a message through Microsoft Teams or asking clarifying questions—triggered symptoms including shortness of breath, dizziness, and chest tightness.

41. By late April 2022, Plaintiff began experiencing renewed anxiety and panic attacks. The symptoms that had once been stabilized through therapy returned with alarming intensity.

42. At no point during onboarding or thereafter did PURE provide Plaintiff with information about

available mental health resources, wellness initiatives, or procedures for seeking reasonable accommodations. Without access to internal support systems, Plaintiff had no institutional recourse to address the work-related stress that was rapidly aggravating her psychological condition.

43. In or around June 2022, as her psychological symptoms escalated, Plaintiff resumed treatment with her long-time therapist, Robert Len (hereinafter "Mr. Len"), in an effort to stabilize her deteriorating mental health.

44. The stress of Plaintiff's work environment—characterized by lack of training, hostility from her supervisor, and ongoing performance pressures—intensified her depressive symptoms. She began to experience a significant regression, marked by emotional withdrawal, extreme fatigue, and difficulty managing basic daily tasks.

45. As her condition worsened, Plaintiff struggled to function in several major life activities, including eating, sleeping, maintaining personal hygiene, focusing on tasks, and engaging in social interactions. These limitations became increasingly disabling and interfered with both her personal life and her ability to perform her job.

46. Plaintiff committed to an ongoing course of weekly psychotherapy with Mr. Len and continued treatment throughout her employment at PURE.

47. To manage her condition, Plaintiff was prescribed Fluoxetine Hydrochloride, a selective serotonin reuptake inhibitor (SSRI) commonly used to treat major depression and anxiety disorders. Pharmacy records show her prescriptions were filled on multiple occasions, including June 30, 2021, July 17, 2021, August 13, 2021, and September 12, 2021, demonstrating the consistent and medically necessary nature of her treatment. **Ex. 2_CVS Pharmacy Medication History for Plaintiff April 28, 2021, April 28, 2024_**

48. Despite her sustained efforts through therapy and medication, Plaintiff's condition reached a critical low point in or around November 2022. Her depression became acute and unmanageable.

49. During this period, Plaintiff reported to her therapist an increase in intrusive suicidal thoughts and feelings of hopelessness. In response, her therapist referred her to a specialist, psychiatrist Dr. Aleen Boyd-Mckoy (hereinafter "Dr. Boyd-Mckoy"), for immediate psychiatric evaluation and medication management.

50. After clinical evaluation, Dr. Boyd-Mckoy diagnosed Plaintiff with Major Depressive Disorder (hereinafter "MDD")—a serious and chronic mental health condition that substantially impaired her ability to function across multiple domains.

51. Major Depressive Disorder (MDD)[5] is a serious mental health condition characterized by persistent feelings of sadness, loss of interest or pleasure in daily activities, significant weight

---

[5] 5 American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed pp. 160-188). Arlington, VA: American Psychiatric Publishing.

changes, sleep disturbances, fatigue, feelings of worthlessness, and difficulty concentrating. These symptoms can cause substantial impairment in social, occupational, or other important areas of functioning. According to the American Psychiatric Association (2013), MDD can vary in severity, duration, and frequency. Still, it often leads to a significant reduction in an individual's ability to function in everyday life (American Psychiatric Association, 2013).

52. This pivotal moment led Ms. Bayonne to seek specialized professional medical assistance.

53. Following a severe mental health crisis, including suicidal thoughts, Complainant's medication regimen was changed to stronger antidepressants and mood stabilizers to address the worsening of her symptoms.

54. To manage her worsening mental health, Plaintiff Bayonne was prescribed Bupropion, an antidepressant used to treat depression and anxiety. She was also prescribed Spironolactone to help stabilize her overall health, as her medical providers recognized the toll that stress and hormonal imbalance were taking on her well-being. These medications were essential for Plaintiff to function both personally and professionally during her employment with Defendants. **Ex. 2_CVS Pharmacy Medication History for Plaintiff April 28, 2021, April 28 2024_**

55. On December 2, 2022, Plaintiff formally disclosed her disability to Defendants by emailing Human Resources Business Partner Sarah Evarts (hereinafter "Ms. Evarts") through her corporate account. In that communication, Plaintiff expressly stated: "I identify as a person with a disability. I have been diagnosed with Major Depressive Disorder. Some days it can be debilitating, which may cause me to be absent from work, and/or the physical office workspace." **Ex. 3_2022.12.2_ Plaintiff emailed Ms. Evarts regarding worsening condition.**

56. In the same email, Plaintiff submitted a detailed and good-faith request for reasonable accommodations designed to allow her to perform her essential job duties despite her disability. Her proposed accommodations included: greater flexibility in remote work and in-office attendance; modified work hours; access to sick leave for mental health reasons; flexible vacation use; periodic time off for therapy appointments; and more frequent or flexible breaks—particularly for crisis moments—along with temporary coverage support when needed.

57. Plaintiff also made a clear and reasonable request for confidentiality regarding her condition, asking that her diagnosis be kept as private as possible and shared only with those who had a legitimate need to know. At the time, Plaintiff had not publicly disclosed her condition and reasonably expected that her privacy would be respected in accordance with both workplace policy and federal law.

58. Although Plaintiff formally notified Human Resources of her disability and accommodation needs by email to Ms. Sarah Evarts on December 2, 2022, she did not receive any immediate acknowledgment or follow-up from HR. In the absence of a timely response, and facing

increasing psychological distress, Plaintiff approached her direct supervisor, Ms. Thapa, to seek support and understanding regarding her condition. At the time of this conversation, Ms. Thapa was already aware of Plaintiff's diagnosis, yet failed to provide any meaningful assistance, empathy, or guidance in response to Plaintiff's disclosure.

59. During that private conversation, Plaintiff shared the severity of her illness with Ms. Thapa, explaining that she had been struggling since April 2022 with basic daily functioning, including eating, sleeping, and social engagement. She disclosed that even minimal work-related tasks, such as composing emails, triggered acute anxiety or panic. Despite this honest and vulnerable disclosure, Plaintiff received no meaningful empathy, intervention, or assistance.

60. Plaintiff further confided to Ms. Thapa that she had been experiencing suicidal thoughts and described her daily reality as living under a constant psychological shadow. She explained that her condition had become overwhelming and was severely affecting both her job performance and her overall wellbeing.

61. Despite this direct and vulnerable disclosure, Defendants failed to provide access to any employee assistance programs, mental health resources, or emotional support services within PURE. Nor did they offer any meaningful workplace flexibility or initiate the interactive process required by law to explore reasonable accommodations tailored to Plaintiff's condition.

62. Defendants PURE did not respond to Plaintiff's formal accommodation request until December 14, 2022—twelve days after she contacted Human Resources on December 2, 2022, and eight days after she personally confided in her direct supervisor, Ms. Thapa, regarding the severity of her mental health condition, including her experience with suicidal thoughts.

63. This disclosure, at a minimum, should have triggered immediate concern and action from the employer regarding the wellbeing of an employee and human being. Instead, the delayed response failed to meaningfully address Plaintiff's urgent medical needs and disregarded the critical nature of her condition.

64. Rather than engage in the good-faith, individualized assessment required by the ADA, Defendants issued a generic response offering minimal and inflexible options, without implementing accommodations tailored to Plaintiff's documented psychiatric disability. **Ex. 4_ 2022.12.14_Email from Ms. Evarts to Plaintiff_**

65. In its December 14, 2022, response, Defendants—through HR representative Sarah Evarts— offered only minimal and generic flexibility. The response imposed a mandatory in-person attendance requirement of two days per week, despite Plaintiff's explicit request for greater flexibility based on her mental health condition. This was particularly unreasonable given that Plaintiff's work as a Staff Accountant was performed entirely through digital platforms and could be completed remotely without any operational disruption. **Ex. 4 2022.12.14_Email from Ms. Evarts to Plaintiff_**

66. Notably, the response did not include any information about PURE's leave policies or procedures, nor did it direct Plaintiff to where such information could be found. At no point did HR reference Plaintiff's rights under the ADA or FMLA, further evidencing Defendants' failure to engage in the individualized, good-faith interactive process required by law.

67. The so-called accommodation offered by Defendants—requiring Plaintiff to report to the office two days per week—was not tailored to her disability-related needs, but rather reflected the standard schedule applied to the entire accounting and finance department. As such, it did not constitute an individualized accommodation under the ADA.

68. Moreover, Defendants failed to specify which in-office days were required or to offer Plaintiff any flexibility or predictability in scheduling. This lack of discretion directly conflicted with Plaintiff's medical documentation and therapeutic treatment plan, which emphasized the importance of reducing anxiety-inducing triggers and allowing for adaptable work conditions.

69. The essential functions of Plaintiff's role, including reconciliations, compliance tracking, and communication, were primarily performed through digital platforms, such as Intacct and Microsoft Teams. Plaintiff's physical presence in the office was not functionally necessary to perform the majority of her duties.

70. While Defendants nominally extended the range of working hours to fall between 7 a.m. and 7 p.m., they still required Plaintiff to complete a full 8-hour shift within that timeframe. This rigid framework disregarded the fluctuating and unpredictable nature of her psychiatric condition and failed to provide the flexibility necessary for her to manage episodes of fatigue, panic, or suicidal ideation.

71. Regarding time off for therapy and mental health management, Defendants insisted on strict adherence to the company's standard leave request procedures—requiring prior supervisor approval, even for urgent medical appointments. This bureaucratic approach created unnecessary barriers and stress, undermining the stated purpose of any accommodation.

72. Defendants also claimed to offer break flexibility of 5 to 20 minutes. However, they provided no individualized plan or guidance for Plaintiff's specific needs, including breaks during acute anxiety episodes or time-sensitive calls with her mental health provider.

73. In reality, Plaintiff was left without meaningful or structured support. Defendants failed to implement any of the specific, reasonable accommodations she requested and instead responded with a template offer that ignored her documented disability and clinical needs.

74. Had Defendants implemented reasonable, individualized accommodations responsive to Plaintiff's clinical condition—such as flexible remote work, modified scheduling, or reduced in-office attendance—Plaintiff could have maintained greater stability in both her mental health and job performance. These accommodations would not have imposed an undue hardship on Defendants, as Plaintiff's role was fully executable through the company's digital platforms and did not require her physical presence in the office to perform essential functions.

75. Following Plaintiff's disclosure of her disability, the tone and treatment from her direct supervisor, Ms. Thapa, shifted noticeably. Plaintiff became subject to increased scrutiny and was frequently micromanaged, with even minor tasks receiving disproportionate criticism.

76. Ms. Thapa began monitoring Plaintiff's work more aggressively than that of her peers, often questioning her output and decisions with a level of intensity that was unwarranted and harmful to her mental health. This escalated surveillance was not performance-driven—it was reactive to Plaintiff's disclosure.

77. Seeking clarity, Plaintiff asked Ms. Thapa why her work was suddenly being scrutinized so closely. Ms. Thapa dismissively replied that this was "standard procedure," despite Plaintiff having worked for the company for over eight months without ever previously being subjected to this level of oversight.

78. After receiving no meaningful explanation from Ms. Thapa, Plaintiff escalated her concerns to Helen Merrit (hereinafter "Ms. Merrit") Vice President and Assistant Controller at PURE Insurance, Ms. Thapa's direct supervisor. Plaintiff explicitly raised concerns that the excessive scrutiny coincided with her disclosure of mental health struggles. Yet again, no corrective action was taken, and the targeted scrutiny persisted.

79. Despite being fully aware of Plaintiff's mental health diagnosis—including her disclosure of suicidal ideation—Defendants proceeded with a highly critical year-end review that failed to acknowledge her disability or consider its impact on her performance. Rather than providing reasonable support, the company used the review process to further isolate and discredit Plaintiff. **Ex. 5_2023.1.18_Plaintiff's 2022 Year-End Review_**

80. Plaintiff Bayonne was given an overall rating of "Improvement Needed," with repeated emphasis on her inability to meet deadlines and her struggles with the bank reconciliation process. he review further claimed that Plaintiff's "ability to concentrate on the compliance aspect of the role" was slow, without any acknowledgment that she had been working through a clinically diagnosed, debilitating mental health condition during the entire evaluation period.

81. Rather than recognizing the documented impact of Plaintiff's Major Depressive Disorder, Defendants focused exclusively on performance metrics, urging her to "be more assertive" and take full ownership of her tasks. This feedback ignored not only her medical condition but also the accommodation request she had submitted weeks prior.

82. The evaluation further criticized Plaintiff for allegedly lacking proactiveness and for missing deadlines, again disregarding the emotional, psychological, and physical impairments she was managing during that time. The review lacked any individualized consideration of Plaintiff's ADA-protected disability, and no effort was made to adapt performance expectations to her known limitations.

83. hen Plaintiff raised concerns about the disconnect between the heightened scrutiny she was receiving and her documented medical condition, Ms. Thapa responded with indifference. At

no point during the meeting did Defendants engage in a meaningful dialogue about adjusting Plaintiff's workload, redistributing tasks, or modifying performance expectations in light of her disability.

84. Nor did Defendants assess whether the limited accommodations outlined by HR representative Ms. Evarts in the December 14, 2022, email were sufficient to address the limitations caused by Plaintiff's Major Depressive Disorder.

85. Defendants failed to initiate or participate in any interactive process, as required under the ADA, thereby neglecting their legal duty to explore, evaluate, and implement reasonable accommodations in good faith.

86. Throughout 2023, Plaintiff's psychological and physical condition continued to deteriorate. Despite ongoing therapy, increasing medication dosages, and visible signs of distress, Defendants did not initiate, offer, or suggest a medical leave of absence that could have helped stabilize her condition.

87. Even though Defendants had actual knowledge of Plaintiff's Major Depressive Disorder—and the fact that she had disclosed suicidal ideation and submitted an accommodation request— Defendants failed to inform her of her eligibility for leave under the Family and Medical Leave Act (FMLA). This omission deprived Plaintiff of her federally protected right to seek medical leave for a serious health condition.

88. By April 2023, Plaintiff's mental health had deteriorated to such a degree that she was prescribed additional medication to manage physical symptoms manifesting from prolonged psychological stress, including nausea, vomiting, and irritable bowel syndrome. These symptoms were directly linked to untreated anxiety and depression.

89. In April 2023, Plaintiff's treating providers determined that her condition was worsening and required stronger medical intervention. Her treatment plan was adjusted to address the intensifying mental and emotional distress she was experiencing. Despite this clear indication that her health was declining, Defendants made no effort to revisit her accommodation, assess whether her work conditions remained manageable, or discuss whether a leave of absence might be necessary. Defendants ignored the warning signs and failed to comply with their legal obligations under the ADA and FMLA to engage in a meaningful dialogue or offer additional support. **Ex. 2_CVS Pharmacy Medication History for Plaintiff April 28, 2021, April 28 2024_**

90. Despite the clear escalation of Plaintiff's medical and psychological symptoms throughout 2023, Defendants made no meaningful effort to monitor her condition, follow up on her prior accommodation request, or engage in any form of cooperative dialogue as required by law.

91. At no point during the calendar year did Defendants schedule a meeting with Plaintiff to assess whether her existing accommodations were effective, whether her condition had improved or worsened, or whether alternative support measures were needed to enable her to continue

performing the essential functions of her role.

92. Defendants neither requested updated medical documentation nor initiated a reassessment of Plaintiff's needs despite having ongoing knowledge of her deteriorating mental health, elevated medication dosages, and caregiving burdens.

93. Instead, Defendants adopted a "set-it-and-forget-it" approach, treating Plaintiff's December 2022 accommodation as permanently sufficient—failing to revisit it even as her symptoms worsened and her need for flexibility became more urgent.

94. This absence of communication, follow-up, or proactive engagement demonstrates a total breakdown in the interactive process required by the ADA and reflects Defendants' disregard for Plaintiff's evolving condition. Throughout 2023, Plaintiff remained in a state of chronic emotional and physical distress without receiving any updated support, reevaluation, or legally required intervention.

## PLAINTIFF BAYONNE'S ROLE AS A CAREGIVER AND ENTITLEMENT TO FMLA PROTECTIONS DUE TO HER FATHER'S SERIOUS HEALTH CONDITION

95. Plaintiff Bayonne's father, Bernadin Bayonne ("Mr. Bayonne"), suffers from multiple chronic and debilitating conditions, including schizophrenia, paranoid psychosis, benign prostatic hyperplasia (BPH), chronic obstructive pulmonary disease (COPD), gastroesophageal reflux disease (GERD), and glaucoma. His psychiatric conditions, in particular, have resulted in repeated hospitalizations and require continuous supervision. In February 2021, he was admitted to a psychiatric facility for treatment following a severe episode of paranoid psychosis.

96. In addition to his psychiatric diagnoses, Mr. Bayonne has experienced multiple acute physical crises, including a renal mass, chest pain, and episodes of acute psychosis—all of which have required emergency intervention and hospitalization.

97. One such emergency occurred in December 2023, when he was hospitalized at Good Samaritan Hospital in critical condition and remained there until his discharge on January 6, 2024.

98. Throughout these ongoing crises, Plaintiff Bayonne has served as her father's primary caregiver. Plaintiff has been solely responsible for coordinating his psychiatric and medical care, managing his appointments and medication regimens, and responding to emergencies. This caregiving role imposed a constant and significant emotional and logistical burden on Plaintiff, which compounded her existing mental health challenges.

99. Due to the unpredictable and severe nature of her father's health, Plaintiff was frequently required to modify her work schedule and remain available for urgent interventions. These responsibilities made workplace flexibility not merely beneficial but medically and legally necessary.

100. On December 23, 2023, during a routine check on her father's apartment, Plaintiff was forced

to break down the door after receiving no response. Concerned neighbors informed her that he had not been seen for several days.

101. Upon entering the apartment, Plaintiff found Mr. Bayonne disoriented, babbling incoherently about someone stealing his credit card and being chased—manifestations consistent with his psychiatric condition. He was confused, incoherent, and clearly in need of immediate medical intervention.

102. Mr. Bayonne was discovered sitting nearly naked inside a plastic storage bin, delirious and physically compromised. His physical surroundings were in a state of extreme disarray, suggesting he had been in this condition for days. The scene reflected not only the severity of his condition, but also the profound level of support he required—support Plaintiff was solely responsible for providing.



Figure 2. Plaintiff's father, during a psychiatric episode, found disoriented and sitting in a plastic bin, December 23, 2023.

103. The apartment was in a state of complete chaos, with personal belongings strewn haphazardly across the floor, suggesting he had been suffering in these conditions for an extended period. His physical state was even more alarming, marked by an overwhelming sense of disorientation.



Figure 3. Condition of Plaintiff's father's apartment, showing the disarray and neglect during his psychiatric episode, December 23, 2023.

104. Realizing the severity of the situation, Plaintiff Bayonne immediately rushed Mr. Bayonne to the emergency room. In addition to his schizophrenia, he was diagnosed with several other severe medical conditions that posed a serious risk to his life, leading to his hospitalization. **Ex. 6_2021.6.2 _Medical History Summary of Plaintiff's Father, Mr. Bernadin Bayonne_**

105. Mr. Bayonne remained hospitalized for approximately one month, receiving continuous medical attention to stabilize his condition and address both psychiatric and physical complications.

106. During his hospitalization, he underwent a series of medical and psychiatric interventions, including medication adjustments, diagnostic evaluations, and monitoring to manage his complex health needs.

107. Plaintiff promptly notified her employer of the emergency and requested time off to attend to her father's care. However, Defendants failed to offer any formal accommodations or inform her of her eligibility for protected leave under the FMLA, despite knowing the nature and urgency of her caregiving responsibilities.

108. In the final week of December 2023, just days after the emergency involving her father, Plaintiff personally informed both her direct supervisor, Ms. Thapa, Ms. Merrit, Vice President and Assistant Controller at PURE Insurance, about her father's severe medical condition and recent hospitalization. Despite the seriousness of the situation and Plaintiff's clearly communicated role as his primary caregiver, neither supervisor offered any additional support, flexibility, or guidance regarding leave options or workplace accommodations.

109. Although overwhelmed by the demands of caregiving and her own ongoing health issues, Plaintiff refrained from formally requesting time off. She feared that doing so would worsen

the retaliatory scrutiny she was already experiencing after disclosing her disability. In an effort to protect her job, she continued to report to the office as often as possible, even when doing so came at the direct expense of her health and stability.

110. As her father's condition remained unstable, Plaintiff's need to work remotely increased. She attempted to manage her schedule informally to remain close to him, but PURE Insurance failed to provide consistent or supportive flexibility. Instead, she was left to negotiate in-office attendance on an ad hoc basis, with no formal adjustments to her work expectations.

111. Despite Plaintiff's clear eligibility for leave under the Family and Medical Leave Act (FMLA) due to her father's serious health condition, neither her supervisors nor Human Resources informed her of her rights or options. Defendants continued to apply the same limited accommodation granted in December 2022, without reassessing its adequacy as Plaintiff's caregiving needs intensified. Upon information and belief, other employees with disabilities or caregiving responsibilities received individualized accommodations, including remote work flexibility. In contrast, Defendants failed to engage in any meaningful interactive process with Plaintiff or consider reasonable modifications, thereby subjecting her to disparate treatment in violation of the ADA and FMLA.

## RETALIATION AND UNJUST TERMINATION FOLLOWING PROTECTED ACTIVITIES

112. In or around November 2023, Ms. Thapa instructed Plaintiff Bayonne to adjust her in-office schedule to align with hers, specifically requiring attendance on the same days. This directive effectively revoked the accommodation Plaintiff had received from Human Resources in December 2022, which allowed her to work remotely with only one required day in the office. Without consulting Human Resources or engaging in any formal modification of her accommodations, Ms. Thapa unilaterally changed Plaintiff's in-office days from Tuesdays and Wednesdays to Wednesdays and Thursdays.

113. This change remained in effect for the remainder of Plaintiff's tenure at PURE Insurance, despite the absence of any documented business necessity or individualized reassessment of Plaintiff's health condition.

114. Even after Plaintiff notified her supervisors of her father's emergency hospitalization in December 2023 and the worsening of her own medical condition, Ms. Thapa continued to enforce the new in-office requirement without exception. This disregard for Plaintiff's circumstances placed additional stress on her and directly contributed to the worsening of her mental health.

115. On or around January 9, 2024, Plaintiff became aware that employees in the Finance Department had received salary increases.

116. Based on a conversation with her colleague, Caleb Kubiak, Plaintiff learned that most of her peers had received salary increases of approximately 6%, while she received only a 3% raise.

117. During their exchange, Mr. Kubiak informed Plaintiff that his raise was double the percentage of hers, confirming the existence of a significant disparity.

118. Mr. Kubiak, who had access to departmental compensation data, later revealed that Plaintiff's raise was the lowest among similarly situated employees, raising serious concerns regarding disparate treatment, especially in light of Plaintiff's known disability and caregiving responsibilities.

119. On or about January 22, 2024, Plaintiff approached her supervisor, Ms. Thapa, to inquire about the discrepancy in her salary increase and whether it was performance-related. Plaintiff highlighted that she had complied with all attendance and reporting procedures and continued to meet her obligations despite considerable personal hardship.

120. Plaintiff further emphasized that she had attempted to fulfill her responsibilities under increasing pressure, managing both her mental health condition and the care of her ailing father, while remaining communicative and present during work hours.

121. In response, Ms. Thapa summarily dismissed Plaintiff's concerns, stating, "That order comes from above and is based on performance, Nadine. I have nothing to do with it."

122. Plaintiff, a qualified individual with a disability under the Americans with Disabilities Act (ADA), experienced disparate treatment in connection with her annual salary increase. Despite comparable responsibilities and tenure, and upon information and belief, other employees in her department—some of whom also had documented disabilities or accommodations—did not experience a reduction in their annual increases.

123. Ms. Thapa never followed up on Plaintiff's inquiries nor provided any documentation or performance-based rationale to justify the reduced raise. Her refusal to offer transparency or meaningful dialogue reinforced Plaintiff's belief that she was being penalized, at least in part, because of her disability and her role as a caregiver, in violation of her rights under federal disability law.

124. On or around January 30, 2024, Ms. Thapa conducted Plaintiff Bayonne's 2023 year-end performance review in person at the White Plains office. **Ex. 7_2024.1.30_Plaintiff's 2023 Year-End Review_.**

125. The performance evaluation acknowledged several key improvements in Plaintiff's work, including her completion of timely reconciliations, collaboration on automation efforts, and meaningful contributions to team workflow. These accomplishments were especially notable considering Plaintiff's ongoing struggle with Major Depressive Disorder and the increasing caregiving demands related to her father's serious medical condition. **Ex. 7_2024.1.30_Plaintiff's 2023 Year-End Review_.**

126. The 2023 review indicates that Plaintiff met the majority of her goals for the year. It confirms she made substantial strides in her role despite the stress imposed by both her health condition and personal obligations as a caregiver.

127. Although Ms. Thapa made brief and vague comments about Plaintiff's "attitude" and "cultural contribution," the tone of the evaluation remained generally dismissive. The feedback failed to acknowledge the full scope of Plaintiff's performance—particularly the significant improvements she made while managing serious health challenges and lacking meaningful support from management. Ms. Thapa never indicated during their meetings that Plaintiff's performance had met expectations or that she had completed the objectives set forth in the PIP.

128. Despite the existence of this written performance review, Plaintiff was never provided a copy, nor was it shared or discussed in any detailed or transparent manner. At no point did Ms. Thapa affirm that Plaintiff had successfully completed the PIP or recognized her progress. Instead, she continued to criticize Plaintiff's performance in vague terms and insisted that "more improvement" was still needed.

129. This ongoing lack of acknowledgment, combined with the absence of any formal closure or communication about the PIP, kept Plaintiff in a constant state of uncertainty and stress, further aggravating her documented mental health condition.

130. Rather than alleviating expectations in light of her clinical diagnosis and caregiver role, Ms. Thapa maintained an unyielding standard, offering no flexibility and contributing to a workplace environment that further exacerbated Plaintiff's mental health.

131. Had Defendants acknowledged Plaintiff's documented improvements—and her persistence in meeting objectives despite multiple compounding hardships—they could have adjusted their approach to supervision or extended modified support. Instead, their continued scrutiny and disregard for the performance context only reinforced the perception of discriminatory and retaliatory treatment.

132. Despite the documented improvements in her 2023 performance review, Plaintiff continued to face heightened scrutiny and micromanagement from her direct supervisor, Ms. Thapa. Instead of acknowledging Plaintiff's progress, Ms. Thapa frequently minimized her contributions, intensified oversight, and conveyed that Plaintiff's performance was still inadequate. This ongoing pressure created a psychologically hostile environment that undermined Plaintiff's mental health and sense of professional stability.

133. The persistent surveillance and dismissal of her efforts significantly worsened Plaintiff Bayonne's overall wellbeing. By early 2024, the stress related to this work environment began manifesting in physical symptoms.

134. On February 28, 2024, Plaintiff had to visit her OB/GYN, Dr. Romelle J. Maloney, due to abnormal uterine bleeding (AUB). During the consultation, Dr. Maloney identified high stress levels as a contributing factor to Plaintiff's condition. Lab tests were ordered, including DHEA-sulfate, Estradiol, and Prolactin panels, to assess the hormonal and physiological impact of ongoing emotional strain. **Ex. 8_2024.02.28_Medical Visit Summary: Stress-Related Bleeding Diagnosis_.**

135. This medical evaluation directly linked Plaintiff's deteriorating physical health to the excessive workplace stress she endured at PURE Insurance. Rather than improving after her favorable review, her condition worsened due to the unrelenting work pressure and lack of meaningful support or acknowledgment.

136. On March 13, 2024, Plaintiff Bayonne raised concerns with Ms. Merrit regarding the unequal treatment she experienced from Ms. Thapa and the limited salary increase she received. During the conversation, Defendants asserted that the raise was based solely on performance. However, Plaintiff expressed disbelief, pointing out that she even had to instruct some of the employees, who received a 6% raise, on how to perform their duties. **Ex. 9_2024.03.13_Transcript of Plaintiff Feedback. Compensation Discussion and Compliance Issues Raised to Hellen Merrit_**

137. During a March 13, 2024 meeting with Ms. Merrit, Plaintiff Bayonne expressed deep frustration over the overwhelming volume of tasks assigned to her—particularly her dual responsibility for bank reconciliations and compliance work. She emphasized that, despite consistently managing time-consuming and complex duties, her workload was not fairly recognized by her supervisors. **Ex. 9_2024.03.13_Transcript of Plaintiff Feedback. Compensation Discussion and Compliance Issues Raised to Hellen Merrit_**

138. Plaintiff also highlighted the disconnect between the positive verbal feedback she occasionally received from her direct supervisor, Ms. Thapa, and the critical tone in her formal evaluations. This inconsistency added to Plaintiff's confusion and sense of being undervalued. **Ex. 9_2024.03.13_Transcript of Plaintiff Feedback. Compensation Discussion and Compliance Issues Raised to Hellen Merrit_**

139. She further explained that despite her repeated attempts to improve and contribute meaningfully to the company, she was met with indifference: "Every time Bhumika [Ms. Thapa] and I get on a really good foot, it seems like something else happens... but when it comes to acknowledging the things that I do for the company, it's like you don't do anything." **Ex. 9_2024.03.13_Transcript of Plaintiff Feedback. Compensation Discussion and Compliance Issues Raised to Hellen Merrit_**

140. Plaintiff also raised concerns about salary disparities. She noted that, despite working additional hours and meeting deadlines, she received only a minimal raise reflective of inflation, not merit. "When we were talking about a raise, she [Ms. Thapa] told me that I was getting 3 point whatever. And that's just an adjustment for inflation." Plaintiff also pointed out that other employees—whose work she sometimes had to guide—were granted raises nearly double hers, casting further doubt on the "performance-based" justification. **Ex. 9_2024.03.13_Transcript of Plaintiff Feedback. Compensation Discussion and Compliance Issues Raised to Hellen Merrit_**

141. In response, Ms. Merrit repeated the company line: "I feel that if you put in more time and you do everything you were hired to do and you did it well, you would be rewarded…" Yet, she

failed to produce any documentation or evidence of underperformance, nor did she offer to review or provide Plaintiff's 2023 year-end evaluation, which documented clear progress. **Ex. 9_2024.03.13_Transcript of Plaintiff Feedback. Compensation Discussion and Compliance Issues Raised to Hellen Merrit_**

142. Plaintiff also expressed concern over the lack of accountability among team members. She described an uneven distribution of responsibility: "There's no accountability on their side... if I don't do my job or if they are lacking and you expect me to communicate with them, it's on me. There's nothing that's ever on them regarding them communicating to me what's going on." **Ex. 9_2024.03.13_Transcript of Plaintiff Feedback. Compensation Discussion and Compliance Issues Raised to Hellen Merrit_**

143. This uneven standard placed disproportionate responsibility on Plaintiff to complete joint tasks, even when her colleagues failed to do their part—despite her repeated efforts to request accountability and clarity in processes.

144. Ms. Merrit acknowledged Plaintiff's difficult personal circumstances, stating, "I know you had family issues... I tried, honestly." However, this statement rang hollow given the lack of meaningful, updated accommodations or proactive engagement in the interactive process.

145. Although Defendants initially granted limited accommodations in December 2022, these were later modified or disregarded altogether at the discretion of Plaintiff's supervisors. Defendants never re-evaluated whether those accommodations remained appropriate in light of Plaintiff's ongoing disability or caregiving responsibilities, effectively forcing her to work under conditions that were medically and emotionally unsustainable.

146. For instance, on March 25, 2024, Plaintiff Bayonne's father was rushed to the hospital in critical condition. Medical staff informed Plaintiff that her father had experienced a serious health emergency involving oxygen deprivation to the brain. At the time of admission, he was unresponsive, unable to speak, and not eating.

147. Given the critical and deteriorating condition of her father—who was hospitalized, non-verbal, and unable to eat—Plaintiff Bayonne was required to remain physically present at the hospital to oversee his care and respond to medical staff.

148. Despite this, Plaintiff was still expected to remain available for work and meet the same demanding performance expectations as her peers. In an effort to comply, Plaintiff brought her work-issued laptop to the hospital and attempted to continue fulfilling her professional responsibilities from her father's bedside, anticipating that she would be called upon for tasks or work communications at any time.

149. On the morning of March 26, 2024, Plaintiff attempted to notify her direct supervisor, Ms. Bhumika Thapa, of her father's emergency and requested to work remotely for the day. Plaintiff called Ms. Thapa from the hospital's landline, as she did not have cellular service within the hospital.

150. Despite Plaintiff's explanation of her father's deteriorating condition and her availability to work remotely, Ms. Thapa denied the request and instructed Plaintiff that she was required to report in person to the office that day.

151. Despite the medical emergency involving her father, who remained hospitalized in critical condition and unable to communicate, Plaintiff was instructed by her supervisor to report to the office. Left with no alternative and fearing further retaliation or discipline, Plaintiff was forced to leave her father's bedside and commute to work. Ms. Bayonne arrived at the office visibly distraught, yet continued to perform her duties under extreme emotional distress.

152. Defendants made no effort to offer remote flexibility or temporary relief, despite having been fully informed of the gravity of the situation.

153. Defendants' refusal to permit Plaintiff to work remotely on March 26, 2024—despite her clear ability and willingness to do so, and despite the urgent medical emergency involving her disabled father—further illustrates their pattern of denying reasonable flexibility and failing to engage in the interactive process as required under the Americans with Disabilities Act (ADA).

154. The forced in-office attendance under these circumstances not only disregarded Plaintiff's previously approved accommodations but also demonstrated Defendants' willful indifference to Plaintiff's status as a caregiver of a disabled family member, in violation of her rights under the Family and Medical Leave Act (FMLA).

155. This incident underscores Defendants' ongoing failure to reassess or modify Plaintiff's accommodations in light of her evolving circumstances, and further supports Plaintiff's claims of associational discrimination, retaliation, and the creation of a hostile work environment in violation of both federal and state disability rights laws.

156. In or around the final days of March 2024, Plaintiff Bayonne formally escalated her concerns by submitting a written complaint to Human Resources. She reported the continued scrutiny and disparate treatment she experienced from her direct supervisor, Ms. Thapa, and highlighted that she had previously raised these issues with Ms. Merrit during their March 13, 2024 conversation—without any corrective action being taken.

157. Plaintiff expressed to Human Resources her belief that Ms. Merrit failed to intervene due to her close personal relationship with Ms. Thapa, which compromised her ability to address the situation objectively and fairly.

158. Despite the seriousness of the complaint—including issues of disability discrimination, retaliation, and unequal treatment—Defendants took no meaningful steps to investigate or remediate the concerns. The conduct by Ms. Thapa persisted without consequence, leaving Plaintiff in the same hostile and unsupported work environment.

159. On April 23, 2024, Plaintiff Bayonne was summoned to a meeting with Ms. Merrit and Ms. Thapa in Defendants PURE's offices.

160. Before the start of the meeting, Plaintiff updated them on her father's deteriorating health and

informed them that he had recently suffered from hypoxia, further complicating her already challenging circumstances.

161. Although both Ms. Merrit and Ms. Thapa expressed superficial sympathy regarding her father's health struggles, the meeting was conducted in a very hostile way.

162. Ms. Thapa initiated the April 23, 2024, meeting by criticizing Plaintiff Bayonne's work performance without giving her a fair opportunity to defend herself. Ms. Thapa frequently interrupted Plaintiff Bayonne, clarifying that this meeting did not allow the Plaintiff to present her side or refute the allegations. Instead, her supervisors, Ms. Thapa and Ms. Merrit, acted as judge, jury, and executioner, leaving the Plaintiff with no option other than to listen to their accusations.

163. During the meeting, Ms. Merrit and Ms. Thapa informed Plaintiff Bayonne that she would be placed on a Performance Improvement Plan (hereinafter "PIP"). Immediately following this announcement, Ms. Thapa highlighted what Plaintiff perceived as the true motive behind the decision: her need for accommodations.

164. In Ms. Thapa's words, she expressed frustration with Plaintiff's accommodations, stating: "You tell me the like on Wednesdays. You don't even. You just decided not to come to the office, right? As a manager, I think it is respectful for me [if] you tell me if you decide not to just work from home. Right? Like, I think I've been very flexible, to be honest. And then I would just like a little bit of respect that says, hey, I'm not coming to the office." Further adding, "Even though it's required that Tuesdays and Wednesdays you have to be in office." **Ex. 10_2024.04.23_Transcript of Meeting Regarding Performance Improvement Plan and Denial of Accommodations_**

165. Ms. Thapa either forgot or intentionally ignored the fact that Plaintiff Bayonne's absences were not a matter of personal preference or work style but were directly tied to her responsibilities as a caregiver and her well-documented mental health struggles. Both Ms. Merrit and Ms. Thapa were fully aware of these challenges, as they had been informed throughout Plaintiff's tenure.

166. During the meeting, Plaintiff Bayonne raised the issue that her requests for a more flexible schedule, due to her caregiving responsibilities for her father, were not accommodated. She expressed her frustration, stating: "So why so? Why can't my schedule be changed to something more flexible, like something remote I can come in as often as Sam comes in." **Ex. 10_2024.04.23_Transcript of Meeting Regarding Performance Improvement Plan and Denial of Accommodations_**

167. In response, Ms. Thapa acknowledged that other employees were granted similar accommodations. Still, she dismissed Plaintiff's request by merely stating, "He's [Sam] been in the company for eight or nine years, he has been," implying that tenure, not need, was the determining factor for granting flexible work schedules. **Ex. 10_2024.04.23_Transcript of Meeting Regarding Performance Improvement Plan and Denial of Accommodations_**

168. Immediately after, Ms. Merrit, in a dismissive tone, reinforced the rigidity of their decision, stating, "This is non-negotiable," confirming to Plaintiff Bayonne that the decision had already been made without considering her input. **Ex. 10_2024.04.23_Transcript of Meeting Regarding Performance Improvement Plan and Denial of Accommodations_**

169. Left without options or support from any other employees at Defendants PURE, Plaintiff Bayonne asked, "So there is no flexibility. Alright. So then if I am getting a PIP, then should we speak about severance?" and requested to contact HR. **Ex. 10_2024.04.23_Transcript of Meeting Regarding Performance Improvement Plan and Denial of Accommodations_**

170. This request was quickly dismissed by Ms. Merrit, who responded, "I didn't hire you. This is. There's nothing we can negotiate or discuss or even discuss on severance. It's something I don't. I never discuss this within 10 years of this company."

171. Plaintiff Bayonne continued to plead for accommodations to meet the unrealistic performance standards, especially considering her caregiving duties. She highlighted how other employees were afforded such flexibility, stating, "Like I said, the thing about it is I need flexibility. You guys both know what's going on with my dad. I can't guarantee that I'm going to be able to be in the office two days a week… So instead of doing all of this, I might as well if what you're saying is if I don't meet your standard as far as attendance, which most likely, I'm not going to. We can just talk about severance." **Ex. 10_2024.04.23_Transcript of Meeting Regarding Performance Improvement Plan and Denial of Accommodations_**

172. Acknowledging that the true aim of the meeting was to remove her accommodations and subject her to a biased Performance Improvement Plan (PIP) designed to fail, Plaintiff Bayonne conveyed to them, "It's the attendance that I don't think that I'm going to be able to meet and in the event that it's required, like there's no point of putting me on a PIP… because I cannot guarantee that I'm going to be in the office as much as you guys want me to be. So if that's a part of the PIP, I'm not going to meet the requirement." **Ex. 10_2024.04.23_Transcript of Meeting Regarding Performance Improvement Plan and Denial of Accommodations_**

173. By the end of the meeting, it became evident that Defendants was unwilling to offer any meaningful accommodations or flexibility. Plaintiff was instructed to return her work implements, including her laptop and badge, signaling an imminent termination. This demonstrates Defendants' failure to engage in a good faith interactive process regarding accommodations for Plaintiff's ongoing health and family issues.

174. As Ms. Merrit concluded the meeting, she effectively terminated Plaintiff by stating, "Sounds like. There's gonna be. It's not going to work out. So I need. What I need from you is your... Personal e-mail where you can be reached and the phone number where HR can reach you. You can leave your badge, your computer, and everything. Here, they will get in touch with you to discuss."

175. The April 23, 2024, meeting marked the end of any good-faith efforts by Defendants to provide reasonable accommodations or engage in a meaningful interactive dialogue concerning

Plaintiff's medical needs and caregiving responsibilities.

176. Immediately thereafter, Plaintiff Bayonne contacted HR Specialist Melissa Berman ("Ms. Berman") and Vice President of Human Resources Swati Goel-Patel ("Ms. Goel-Patel") to dispute the outcome of the meeting and raise serious concerns about the retaliatory nature of the Performance Improvement Plan (PIP). She explained that the PIP was being improperly used to eliminate her accommodations and that she had never been given a copy of the document to review or respond to its contents.

177. In response, Ms. Goel-Patel stated she would raise the issue with management and assured Plaintiff that an amended PIP would be considered—one that would take her accommodation needs into account.

178. On April 24, 2024, Plaintiff followed up in writing with Ms. Goel-Patel, reiterating her request for a copy of the original PIP and asking for clarification regarding its contents and whether it would be revised to reflect her health-related limitations. **Ex. 11_2024.04.24_Plaintiff's Written Request to HR for Copy of PIP_**

179. Later that same day, Ms. Goel-Patel scheduled a call with Plaintiff to discuss the matter further.

180. During their April 24, 2024 conversation, Ms. Goel-Patel falsely claimed that Plaintiff had resigned during the prior meeting. Plaintiff immediately corrected the record, clarifying that she had not resigned but had merely requested a discussion about severance after being told her accommodation could not be honored. Plaintiff again requested a copy of the PIP, but Ms. Goel-Patel refused to provide it, stating it could not be sent to a non-corporate email address— despite the fact that Plaintiff had already been asked to return her company-issued equipment.

181. On April 25, 2024, Plaintiff received a call from Ms. Goel-Patel and Ms. Berman, during which she was formally terminated. When Plaintiff asked for the reasons behind her termination and noted her belief that it was connected to her earlier complaints of discrimination and retaliation, Ms. Berman vaguely cited "performance issues" without offering any specific examples or documentation to support the claim. **Ex. 12_2024.04.25_Transcript of Termination Call with HR Representatives Goel-Patel and Berman**

182. Plaintiff responded with concern and disbelief, pointing out the suspicious timing between her protected activity—specifically, her March 2024 complaint regarding Ms. Thapa—and the issuance of a PIP followed by termination, all within a matter of weeks. She stated, "I voiced my concerns about the treatment I was getting from Bhumika [Ms. Thapa] in March, and then literally a month later, I'm getting a PIP. Then within the same day, I'm being terminated without even having the opportunity to try and meet the PIP terms." **Ex. 12_2024.04.25_Transcript of Termination Call with HR Representatives Goel-Patel and Berman**

183. The sequence of events makes clear that the Performance Improvement Plan (PIP) was never intended to provide Plaintiff with a genuine opportunity to improve. Instead, it functioned as a

pretext to justify her termination while circumventing further accommodations or reassessment of her eligibility under the ADA and FMLA. Plaintiff was terminated the very same day the PIP was introduced—before she was ever given a chance to review, respond to, or act on its contents.

184. The basis for her termination was not rooted in any documented or substantiated performance deficiencies, but rather her stated inability to comply with an inflexible in-office attendance policy that conflicted with her disability-related accommodation needs and caregiving responsibilities.

185. Defendants failed to communicate any clear expectations or corrective measures tied to performance, and only elevated these alleged deficiencies after Plaintiff began engaging in protected activity, including internal complaints about discrimination and retaliation. This context confirms that the PIP was not a legitimate performance management tool, but rather a retaliatory device used to eliminate Plaintiff from the workplace.

186. Shortly after the April 25, 2024 termination call, Ms. Berman emailed Plaintiff a written summary of the conversation and extended a severance offer equivalent to only three weeks of pay. Plaintiff rejected the offer, maintaining that her termination was unjust, retaliatory, and procedurally improper.

187. Defendants' actions leading up to and including Plaintiff's termination reveal a pattern of discriminatory and retaliatory conduct in violation of federal and state laws.

188. Plaintiff's termination occurred not as a result of any legitimate or documented performance deficiencies, but rather as a direct consequence of her protected activity: disclosing her disability, requesting reasonable accommodations, serving as a caregiver for a seriously ill family member, and reporting mistreatment to Human Resources.

189. Defendants failed to engage in any good-faith interactive process as required by the Americans with Disabilities Act (ADA). Instead, they removed Plaintiff's accommodation, imposed unrealistic attendance demands, fabricated a pretextual Performance Improvement Plan, and swiftly terminated her employment without giving her a meaningful opportunity to respond or comply with any formal improvement plan.

190. Defendants also violated the Family and Medical Leave Act (FMLA) by failing to inform Plaintiff of her rights, failing to designate qualifying absences as protected leave, and denying her the opportunity to take job-protected time off to care for her father or manage her own serious medical condition.

191. At no point did Defendants provide Plaintiff with written notice of her FMLA eligibility or rights, nor did they explore less adverse alternatives to termination despite having knowledge of Plaintiff's deteriorating mental and physical health and her role as a primary caregiver.

192. Plaintiff's experience at PURE Insurance stands in stark contrast to the inclusive and empathetic workplace environment that Defendants publicly claim to uphold. Despite her

consistent efforts to fulfill her professional obligations while managing serious health challenges, Plaintiff was penalized, silenced, and ultimately removed.

193. The facts set forth in this Complaint demonstrate that Defendants acted with deliberate indifference to Plaintiff's rights, and that her termination was the final act in a broader pattern of disability-based discrimination, associational discrimination, failure to accommodate, retaliation, and FMLA interference.

194. As a result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered substantial harm, including but not limited to lost wages, lost benefits, reputational harm, emotional distress, and lasting damage to her professional career and mental health.

## FIRST CAUSE OF ACTION
### (Disability Discrimination – ADA)
Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.
*Asserted by Plaintiff Against all the Defendants*

195. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

196. The provisions of the ADA applied to Defendants and protected Plaintiff while she was employed by Defendants.

197. The ADA prohibits employers like Defendants from taking adverse employment actions against employees like Plaintiff because of their actual or perceived disabilities.

198. Defendants took adverse actions against Plaintiff, including denying flexible accommodations, subjecting her to increased scrutiny, and ultimately terminating her, because of her diagnosed Major Depressive Disorder, a disability under the ADA.

199. By engaging in this discriminatory conduct, Defendants violated the ADA.

200. As a result of the unlawful conduct described herein, Plaintiff suffered harm, including lost wages, emotional distress, and other damages.

## SECOND CAUSE OF ACTION
### (Failure to Accommodate – ADA)
Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.
*Asserted by Plaintiff Against all the Defendants*

201. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

202. The provisions of the ADA applied to Defendants and protected Plaintiff while she was employed by Defendants.

203. The ADA requires employers like Defendants to provide reasonable accommodations to qualified individuals with disabilities so they can perform the essential functions of their jobs.

204. Plaintiff requested reasonable accommodations for her disability, including flexible remote work and scheduling. Defendants initially granted a limited accommodation in December 2022, then failed to update it, and eventually revoked it without justification.

205. By failing to provide reasonable and individualized accommodations or engage in the interactive process, Defendants violated the ADA.

206. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

### THIRD CAUSE OF ACTION
(Associational Discrimination – ADA)
Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.
*Asserted by Plaintiff Against all the Defendants*

207. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

208. The provisions of the ADA applied to Defendants and protected Plaintiff while she was employed by Defendants.

209. The ADA prohibits employers from taking adverse actions against employees based on their known association with individuals who have disabilities.

210. Defendants took adverse actions against Plaintiff—including denying remote flexibility, applying increased scrutiny, and reducing her salary raise—because of her association with her disabled father for whom she was the primary caregiver.

211. By subjecting Plaintiff to less favorable treatment due to her caregiving responsibilities for her father with serious disabilities, Defendants violated the ADA.

212. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

### FOURTH CAUSE OF ACTION
(Retaliation – ADA)
Americans with Disabilities Act (ADA), 42 U.S.C. § 12203
*Asserted by Plaintiff Against all the Defendants*

213. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

214. The provisions of the ADA applied to Defendants and protected Plaintiff while she was employed by Defendants.

215. The ADA prohibits employers from retaliating against an employee for engaging in protected activity, such as requesting accommodations or opposing discriminatory conduct.

216. Defendants retaliated against Plaintiff after she disclosed her disability, requested accommodations, and complained to HR about discriminatory treatment. Retaliatory actions

included increased scrutiny, denial of flexibility, a biased performance improvement plan, and termination.

217. By taking these actions in response to Plaintiff's protected activity, Defendants violated the ADA.

218. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## FIFTH CAUSE OF ACTION
(Hostile Work Environment – ADA)
Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.
*Asserted by Plaintiff Against all the Defendants*

219. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

220. The provisions of the ADA applied to Defendants and protected Plaintiff while she was employed by Defendants.

221. The ADA prohibits employers from subjecting employees to a hostile work environment based on their disability or accommodation requests.

222. Following Plaintiff's disclosure of her disability and repeated requests for accommodations, Defendants subjected her to ongoing surveillance, disproportionate criticism, removal of accommodations, and emotional distress that made her workplace intolerable.

223. By permitting and fostering a hostile work environment, Defendants violated the ADA.

224. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## SIXTH CAUSE OF ACTION
(Interference – FMLA)
Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.
*Asserted by Plaintiff Against all the Defendants*

225. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

226. The provisions of the FMLA applied to Defendants and protected Plaintiff while she was employed by Defendants.

227. The FMLA prohibits employers from interfering with, restraining, or denying an eligible employee's right to take protected leave for a serious health condition or to care for a family member with a serious health condition.

228. Plaintiff was eligible for FMLA leave and provided adequate notice of both her own condition (Major Depressive Disorder) and her father's documented chronic medical conditions. Defendants never informed her of her rights under the FMLA or initiated a protected leave

process.

229. By failing to inform Plaintiff of her rights or provide protected leave, Defendants interfered with Plaintiff's ability to exercise her FMLA entitlements.

230. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## SEVENTH CAUSE OF ACTION
(Failure to Provide FMLA Notice – FMLA)
Family and Medical Leave Act (FMLA), 29 C.F.R. § 825.300
*Asserted by Plaintiff Against all the Defendants*

231. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

232. The provisions of the FMLA applied to Defendants and protected Plaintiff while she was employed by Defendants.

233. The FMLA requires employers to inform employees of their eligibility and rights under the statute, including the process for requesting protected leave.

234. Defendants failed to provide Plaintiff with the required general and individualized notice of her eligibility for FMLA leave, despite clear indications that she qualified for it based on her and her father's serious health conditions.

235. By failing to provide required FMLA notices, Defendants violated the law and deprived Plaintiff of her statutory rights.

236. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## EIGHTH CAUSE OF ACTION
(Disability Discrimination – NYSHRL)
New York State Human Rights Law, N.Y. Exec. Law § 296 et seq.
*Asserted by Plaintiff Against all the Defendants*

237. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

238. The provisions of the NYSHRL applied to Defendants and protected Plaintiff while she was employed by Defendants in New York.

239. The NYSHRL prohibits employers from discriminating against employees based on their disabilities.

240. Defendants took adverse actions against Plaintiff, including removing her accommodations and ultimately terminating her, due to her mental health condition.

241. By engaging in this discriminatory conduct, Defendants violated the NYSHRL.

242. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## NINTH CAUSE OF ACTION
(Failure to Accommodate – NYSHRL)
N.Y. Exec. Law § 296
*Asserted by Plaintiff Against all the Defendants*

243. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

244. The provisions of the NYSHRL applied to Defendants and protected Plaintiff while she was employed by Defendants.

245. The NYSHRL requires employers to reasonably accommodate an employee's disability unless doing so poses an undue hardship.

246. Plaintiff was granted a limited accommodation in December 2022, which was never reassessed and was later revoked without justification.

247. Defendants failed to provide reasonable accommodations or engage in a cooperative dialogue regarding Plaintiff's evolving needs.

248. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## TENTH CAUSE OF ACTION
(Hostile Work Environment – NYSHRL)
N.Y. Exec. Law § 296
*Asserted by Plaintiff Against all the Defendants*

249. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

250. The provisions of the NYSHRL applied to Defendants and protected Plaintiff while she was employed by Defendants.

251. The NYSHRL prohibits employers from creating or permitting a hostile work environment on the basis of disability.

252. Plaintiff experienced ongoing micromanagement, criticism, and denial of accommodations after disclosing her condition and submitting a request for support.

253. These actions collectively created a hostile work environment in violation of the NYSHRL.

254. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## ELEVENTH CAUSE OF ACTION
(Aiding and Abetting Discrimination – NYSHRL)
N.Y. Exec. Law § 296(6)
*Asserted by Plaintiff Against Defendant Leitch*

255. Every fact alleged herein is repeated, re-alleged, and incorporated as though fully set forth herein.

256. The provisions of the NYSHRL applied to Defendant Leitch in his role as CEO of Defendant PURE.

257. Under NYSHRL, it is unlawful for any person to aid, abet, incite, compel, or coerce any discriminatory practice.

258. Despite holding ultimate responsibility for enforcing anti-discrimination policies, Defendant Leitch failed to intervene or act to prevent the unlawful treatment of Plaintiff despite being aware of her complaints and condition.

259. By failing to act, Defendant Leitch aided and abetted the discriminatory conduct that harmed Plaintiff.

260. As a result of the unlawful conduct described herein, Plaintiff suffered harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff's seeks all available remedies available under all causes of action listed herein in this Complaint and any and all remedies that the Court deems just and proper. Including but not limited to All lost wages and benefits, front pay, pre judgment and post judgment interest, liquidated damages, punitive damages, statutory penalties, emotional distress damages; recovery of reasonable costs, attorney fees, and expenses; equitable relief, and any other relief considered just and proper.

Dated:   White Plains, New York
        April 14, 2025

**Jordan El-Hag, Esq.**
**Attorney for Plaintiff**
777 Westchester Ave, Suite 101
White Plains, N.Y, 10604
(914) 218-6190 (p)
(914) 206-4176 (f)
**Email:** Jordan@elhaglaw.com
www.elhaglaw.com